377 So.2d 990 (1979)
FIRST NATIONAL BANK OF FLORIDA, a National Banking Corporation, Appellant,
v.
BRANDON STATE BANK, a Florida Banking Corporation, Appellee.
No. 78-2115.
District Court of Appeal of Florida, Second District.
November 14, 1979.
Rehearing Denied December 20, 1979.
*991 Jeffrey W. Warren of MacFarlane, Ferguson, Allison & Kelly, Tampa, for appellant.
J. Michael Hayes of Gregory, Courts, Paniello, Johnson, Hayes & Hoft, Tampa, for appellee.
OTT, Judge.
This case involves some of the intricacies of everyday banking practices and procedures. We reverse a summary judgment for appellee and return the case for a trial of certain issues hereinafter specified.
A customer deposited a $48,000 check in his account at Brandon State Bank (Brandon) on a Friday. It was immediately credited to the customer's account without any restriction on withdrawals. The day before, Thursday, he had drawn a check on that account for $46,000 and deposited it in his account at Midway Marine Bank (Midway). That check reached Brandon on the following Monday and was routinely paid since the customer's account had been unconditionally credited with the $48,000 deposit.
In the meantime, Brandon had forwarded the $48,000 check to the Jacksonville branch of the Federal Reserve Bank of Atlanta (Federal Reserve) for presentation to the bank on which it was drawn, First National Bank of Florida (First National)  the then normal channel of collection. First National received the check on Monday and ordinarily would have processed it on Tuesday morning, but a computer breakdown delayed the processing until late Tuesday afternoon. It wasn't until 5:30 P.M. that First National placed a call to Federal Reserve to notify it that the check was being returned. No one answered that call; consequently, it was not completed until Federal Reserve reopened at 8:00 A.M. Wednesday morning. However, the check itself was returned to Federal Reserve on Tuesday evening and actually returned by Federal Reserve to Brandon early Wednesday afternoon. By that time, however, in reliance upon Brandon's repeated assurances that the $46,000 check had been paid when presented, Midway had permitted the withdrawal of substantially the entire $46,000.
On those facts, which were uncontroverted, the trial court rendered summary judgment for Brandon on the grounds that First National had been required (1) by Section 674.4-213, Florida Statutes[1] to both revoke its provisional settlement[2]and return the dishonored check directly to Brandon, and (2) by a federal reserve regulation[3] to wire Federal Reserve advice of *992 nonpayment of such item not later than its midnight deadline. We reverse because the court misconstrued the statute and read an unwarranted requirement into the regulation.
Section 674.4-213(1)(d) declares that an item is finally paid if the payor bank does not revoke its provisional settlement and does not return the item directly to the depositary bank by the payor bank's midnight deadline. Because those two conditions are phrased as negatives, the statute can be a bit confusing. The court below was persuaded by appellee that inasmuch as both conditions must be present in order for payment to become final, both affirmative acts contemplated by the two conditions must occur in order to prevent payment from becoming final. But that just isn't so, either as an isolated exercise in logic or as an interpretation of this particular statute. Whenever a concurrence of negative conditions is necessary in order for something to happen, the occurrence of either of the affirmative acts will prevent the happening.[4]
Since it was undisputed that First National revoked its provisional settlement by returning the item to its immediate transferor, Federal Reserve, before its midnight deadline (§ 674.4-301(1), there was no final payment of the check and First National incurred no statutory liability to Brandon. § 674.4-302(1).
Insofar as the regulation is concerned, we find nothing in the regulation itself, or in any case or statute, which requires "wire advice" to be sent by the payor bank's midnight deadline. Common sense tells us, of course, that the purpose of such requirement is to get notice of dishonor to the collecting bank (and thus to the depositary bank) as quickly as possible, and hopefully more quickly than by merely returning the item through normal channels. It is peculiar that no time requirement was included in the regulation, but the indisputable fact is that there is none.
There is a requirement that all "collecting banks" exercise ordinary care in handling items being collected. § 674.4-202. But "payor banks" are expressly excluded from the definition of "collecting banks". § 674.4-105.
That leaves only the general and vague reference in Section 674.4-103(1) and (5) to a duty owed by all banks to use ordinary care, presumably in all their dealings. Obviously, it will require the services of a finder of fact to determine (1) whether First National breached that duty by failing to "wire" advice of dishonor earlier than 8:00 A.M. on Wednesday, (2) whether any such breach was excused by First National's computer breakdown on Tuesday or by the shutdown in communications between 5:00 P.M. Tuesday and 8:00 A.M. Wednesday (§ 674.4-108(2)) and (3) whether Brandon's loss was a direct and proximate result of any such unexcused breach of duty, or the result of its own negligence in permitting its customer to draw against the $48,000 deposit before he had a right to do so. See § 674.4-213(4)(a).
According to the statutes, Brandon's provisional settlement from Federal Reserve never became final because Federal Reserve's provisional settlement from First National never became final. § 674.4-213(2). Moreover, when Federal Reserve received the dishonored check back from First National on Tuesday evening, it had until at least midnight Wednesday to relay notice of such rejection to Brandon. § 674.4-202(1)(b) and (2). It probably had until midnight Thursday. § 674.4-107.
In any event, the only evidence now before the court would indicate that Federal *993 Reserve acted quite expeditiously in getting the rejected check back into Brandon's hands by Wednesday afternoon. That was quite a bit more alacrity than Brandon could legally expect. Of course, it is always possible that a full trial of the issue may develop evidence permitting contrary conclusions.
The summary judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.
HOBSON, Acting C.J., and RYDER, J., concur.
NOTES
[1] § 674.4-213, Fla. Stat. (1967)

(1) An item is finally paid by a payor bank when the bank has done any of the following, ...
.....
(d) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute ... and has not returned the item directly to the depositary bank. .. .
[2] Each bank in the collection chain ordinarily makes a provisional payment to the bank which transfers an item to it. This is usually done the day the item is received. Payor banks (on which items are drawn) then have until midnight of the second day to revoke their provisional settlements. Hence the term "midnight deadline". § 674.4-104(1)(h). The other banks in the chain (collecting banks) also have their midnight deadlines for forwarding items or notices channeled through them. § 674.4-202.
[3] Operating Circular No. 16:

18. [A]ll paying banks ... must . .
.....
(c) WIRE ADVICE of nonpayment of any item of $2,500 or over... . ([T]he term "wire" includes telephone, telegraph, cable or other form of electronic communications.)
[4] To illustrate the theorem, consider a familiar parallel: a judgment becomes final 30 days after entry if an appeal has not been filed and a new trial has not been granted. Both negative conditions are necessary if the judgment is to become final. But the occurrence of either affirmative event (i.e., the filing of an appeal or the granting of a new trial) will prevent the judgment from becoming final. So it is here.